Good afternoon, Your Honors. Tom Friedman on behalf of Plaintiff and Appellant Ken Beck. Your Honor, we've offered several different theories, legal theories. They all really come down, I think, to the same thing, that summary judgment was improperly granted in this case for two reasons. There was substantial evidence of both retaliatory animus and a lack of probable cause to the degree that the defendant police officers should have known that there was no probable cause. One of the primary contentions that the defendants make in their opposition brief is that the Ken Beck's case about a conspiracy by the city officials came straight from his head and didn't exist in the real world. But on the contrary, the record shows that there is substantial, in fact compelling, evidence that was presented to the district court, circumstantial evidence outside of the plaintiff's mere say-so. What we have is we have evidence that the city had a policy that any work to be done by a contractor for the city that was over $5,000 in value had to be put to public bid. You, in this case, even had the public works, head of public works, talked to Ken Beck several months before it was anticipated that this work would be contracted out to tell him in a few months there's going to be a major piece of work here. They're going to be hauling hundreds of thousands of tons of rubble from this major construction site, and there's going to be a public bidding on that. You then have no public bid. You have the city manager, Milheiser. But for purposes of your complaint, don't you have to hook all this up to the arrest? Well, yes. However, it's part of the context. In other words — Yeah, but I want to know how you've hooked any of this up to the arrest. Okay. We hook it up to the arrest because the police report basically says that — I mean, one of the problems is there's just no probable — no even arguable probable cause in the police report as is. Usually somebody in my position would be arguing that if you considered the full context, there would have been no probable cause. Let's assume that for present purposes. Okay. So you have basically Ken Beck telling the police officer, this investigation you're doing of my company is bogus. Yeah, but not saying it so nicely. Not saying it — well, right. Not saying it with whatever decorum possibly. But in order to understand what the significance of that is, you have to look at the context of this. The context is he's talking to the chief of police in light of a history here. Is there any evidence tying the whole sort of strange set of events with regard to this claim and then the zoning case against him and so on to the arrest as opposed to the fact that he sort of flew off the handle a little and the chief of police flew off the handle a little and so on? Yes, Your Honor. You have the chief of police who inserted himself into that contract, who basically tried to get a secret deal made, which would still call for the payment of $350,000 in a contract that was never put to public bid and should have been and probably would have resulted — What does arresting him have to do with that? It was — this was retaliation for he squashed that deal. I mean, this is part — the conspiracy is — the conspiracy is that Ken Beck spoke up and quashed a deal that had $350,000 of money that was really not — you know, there was not some money that was justifiably allocated to this project. There was a lot of money there, and you've got the chief of police inserting himself, and you've got the city manager. Why doesn't the issuance of the criminal complaint by Deputy D.A. Gaetano just immunize the investigators, the police officers, and breaks that relationship between the retaliatory motive, assuming there was one, and the arrest? Well, if there was a retaliatory motive plus the absence of probable cause to the extent that no reasonable officer could have believed that there was probable cause, then that Smitty defense is not operational. But then the Hartman case in the Supreme Court kicks right in, right? That's right. And that's consistent with Malley. And the whole theory of Malley is that — Well, it's sort of a different theory. I mean, it's a very complicated and different theory about retaliatory motives. That's right, but it's complementary because, you know, really what we're talking about here is proximate cause. Let me ask you something. I don't quite understand about the complaint. Let's assume we didn't buy your retaliation theory for the moment, and we were just dealing with how Smitty and Malley interact, which seems to me to be a complete can of worms. Now, in this particular instance, the complaint was actually signed by the police officer, who was also the victim. He also signed the affidavit on the arrest. What is that? I don't understand what — I don't know what was true of the complaint in Smitty, and I'm not even sure I know what the significance of a complaint as opposed to information or indictment is for these purposes. But what did the DA actually have to do with the filing of the complaint? He generated it, and I understand that, and he handed it to him, but then it was signed by the police officer, so he was the one who was attesting to the probable cause, not the DA. And then they go down to some clerk who stamps a number on it. That's what I could get out of the record on. Then what? There's nothing in the record about what happened after that, except we know there was a prosecution eventually. Yeah. Bench warrant is basically automatic with the filing of the felony complaint. Well, that's a bench warrant. What about — where did the prosecution come from at that point? They were — I mean, my understanding is that the warrant is issued, and then the police had already decided, Thuvanol had already told other people, that they were going to arrest Beck that day. Okay. And so — but what Your Honor's pointing up is another part of the Smitty analysis that goes into here is, was there, in fact, any independent judgment exercised by the DA in this case? Yeah. Did the DA actually do anything that led up to the arrest warrant? I mean, other than sort of give legal advice, even if he did at least generate the piece of paper, what did he do that led to the arrest? All he did was essentially, as far as I could tell, as far as the record shows, functioned as, you know, a paralegal almost, or a secretary, and punched some keys, pulled up a form, had it signed. But there must have been something that happened after that that got people into court. Well, after Beck was arrested, they pursued the charges. They did pursue the charges after he was arrested, yes. And it was — you know, this issue was fought in state court, and a motion to dismiss. Does that mean that somebody from the prosecutor's office then filed a piece of paper in court at some point? Is that — I'm just trying to figure out the paper flow here. Yeah. Well, I would — yeah, I assume that that would have had to have happened. But this piece of paper was not that one. This piece of paper, the complaint that was filed by Mendendal, was not something filed in court, was it, or was it? No, I believe that it — the report, I believe, accompanied the complaint. The report accompanied the complaint, which accompanied an affidavit for an arrest warrant. Yes. Yeah, and that's my understanding. And so, you know, in terms of the Smitty argument, you know, the — I mean, it's a complicated case because I think there are a couple different levels of analysis in Smitty. I think that Smitty does stand for the proposition that if you can show some kind of — I'll just use the term malice or animus, then you don't need to go to the other two steps. Let's say we didn't have malice or animus, but we do have self-interest. In other words, what's unusual about this case is that the generating officers were the victims as well, and they were also filed the complaint and they also signed the arrest warrant. Is that enough to dissipate the Smitty assumption? Well, in this case, I think it is. I don't know that there — I don't know that any kind of a per se rule that in all cases where — but in this case where it's — at least there's substantial evidence that the prosecutor really did nothing of any significance. This police report was walked down to the prosecutor's office. The prosecutor apparently read the materials in front of the officer and, you know, that was basically it. He said, okay, we'll file the papers. He pulled up the code and plugged in the information, printed it out, and had it filed. What do you mean had it filed? That's the point I'm trying to get. He didn't even say that. He said he handed it to them and they went and took it and did something with it and applied for an arrest warrant. But did anybody ever file a lawsuit in court? Somebody did at some point file a lawsuit in court, but at what point? Well, I'm not sure. And I'm not sure. I don't believe that that was part of the summary judgment motion. What's been relied upon is the prosecutor's determination to authorize the filing of the complaint that led to the arrest. Counsel, under the California laws that's applied in that county, a felony prosecution, I assume, can be commenced with a complaint, but it has to move through some other charging document before you can get to actually trial on the felony. And it's your understanding that the process was interrupted by a motion to dismiss that terminated the action before any of those further things happened, is that correct? You know, I want to be careful of going outside the bounds of my knowledge. I basically became counsel just on the appeal and looked at the issues that were presented to the district court. It seems to me to matter because somewhere you have to draw a line between Smitty and Malley. And in this case, in Smitty there was an arrest before the, quote, complaint issued, whatever that means. In this case there wasn't, but there could have been for all we know. And Malley, on the other hand, seems to say, does say quite plainly that the fact that there's an intervening determination before the arrest by the magistrate doesn't matter. And here, at least from the magistrate's point of view, he didn't, I don't know what he had different than he would have had in Malley. He had a complaint by the police, not by the DA, and he had the DA, he had the policeman who was the victim, and he had an affidavit from the policeman, not by the DA. So I don't know what he had that was different than in Malley when he issued the arrest warrant. So I don't know why, what there could be that's different in breaking the chain of causation. But I know that from Smitty that something comes in to break the chain of causation, but I'm not too clear what the something is. Well, I mean, the way I read Smitty, the something is the independent judgment being exercised by the prosecutor and To make a final prosecution decision? To make the decision to file the complaint. I mean, you know, prosecutors, you know, the idea is that if you're talking about breaking causation, simply presenting a piece of paper to a prosecutor and having him just process that by filing a complaint and having an arrest warrant and then, you know, which allows the police to show up with four police cars. The police didn't need a complaint to get an arrest warrant, right? They could have filed a declaration without an arrest warrant. Is that right? Well, if they had probable cause. Probable cause. Sure. Right. Yeah. But apparently, you know, this was, you know, a more aggressive way to do it. Okay. Thank you for your argument. Thank you. Good afternoon. I'd like to address the points you just discussed, but I do have one other thing that I would say first. Counsel's incorrect when, in their brief, they assume away the issue of probable cause because, in fact, the California Supreme Court, in the case that they cite, People v. Hines, in 1997, held that a statement to a police officer that the officer would be sorry he ever saw me or you'll be sorry you ever saw me. Is that all they said in that case? Hmm? That was the total of what they said in that case? Yes, as to the threat, and that's on page 1060. What the court did is it analyzed three different statements, and it said that each one of them, the others were more. The others said, you know, I'm going to kill you or something like that, but they were later. The court said this statement, standing alone, was a threat sufficient to violate Penal Code Section 69, and that's the last word on the subject. So whether we agree with it or not, that's what the state of the law was when Sergeant Mendenhall gave this report to the DA, and it's what the state of the law was when the DA looked at it and said, telling somebody that, if you'll pardon me. That case is not cited in your brief, is it? In our brief? No, it's cited in their brief. I can tell you where. I don't have it, so I can't respond, but go ahead. It's cited in page 33 of their brief, where they make the argument that there was no probable cause. All right, I'm listening. Okay. If telling somebody, you're going to be sorry you ever saw me, when they're in a confrontational situation, and you say that to a police officer, constitutes a threat under Penal Code Section 69, then telling somebody, you better fucking back off because you don't fucking know who you're dealing with, certainly, at the very least, is not so far removed that a reasonable officer, having read People v. Hines, if we assume that it was read, or a district attorney who is familiar with People v. Hines, would have to look at that statement and say, I can't conclude that that's not a threat. Apparently it is. You can conclude that it's not a threat if there's no implication of violence, and certainly context plays some part in that. I understand that. The Superior Court in this case looked at all of this and said, clearly under the dispositive decisions of the California Supreme Court, there was no threat of violence. Actually, that's not exactly what the court said. If you read the transcripts that's in the record, and I don't mean to— No, no. What the court said is that I find, under the applicable case law, that the statement itself has to say violence. It has to say, I'm going to hit you or I'm going to kill you or I'm going to do something like that. Didn't the declarations of the individuals involved indicate that their understanding was that it was threatening their job function? Yes, and what People v. Hines said is that's irrelevant. But one of them was that officer, right? Yes. So if he understood that statement as threatening his job function and not being a threat of violence— He didn't exactly say that either. He was asked whether or not at the time the statement was made he felt threatened then. He was not asked on the witness stand, and I may be wrong. The declaration. I may be misciting the record. I believe that Mr. Beck was threatening Chief Thuvanel's position or employment as police chief and my position or employment as sergeant if the Upland Police Department's Code Enforcement Division did not cease its code enforcement activities with respect to Mr. Beck's business. I stand corrected. But that doesn't make the statement not a threat under People v. Hines because— Not a threat of violence if that was his understanding. Everybody who's looked at this, including the people who are there, thought it was not a threat of violence. I don't disagree with what you're saying, but you ask what did they actually do with the DA. They took the report. They gave it to the DA. Counsel misquotes the record. The record was he didn't stand there with the DA while the DA looked at it. The DA testified— Why didn't he type something up? He generated a program. It generated a complaint. But what's the significance of the fact that the complaint was signed by Mendenhall? It wasn't signed by the DA. That is the routine procedure out of that office. I understand that. So Hull was asserting that there was probable cause. Up until that point, it wasn't the DA. It was Mendenhall. No, that's incorrect. Why? On the record. Mendenhall testified that I talked to the chief. The chief said, take it over to the DA and see if he wants to issue a complaint. Don't tell him we want to issue a complaint. Don't do anything like that. I just want to see what he thinks about this. Mendenhall says, that's what I did. The DA says— Well, one thing that's difficult about this case, by the way, in terms of the record, is that the depositions cut off at every point because there was an instructor not to answer on every issue that might matter with regard to exceptions to the SMITE exceptions or to the presumption. Like, for example, did you feel pressured, and why did you do this, and so on. So we don't really know because he wasn't allowed to answer exactly what went on in terms of that interaction. Well, that, again, is not—I don't think that gets the entire flavor of it. He was asked, and he answered, were you told that they wanted you to issue a complaint? No, I wasn't. Were you told that they wanted you to do anything? No, I wasn't. Now you have a chief of police claiming that he was the victim of a threat, and you have somebody going in to the DA asking—you have essentially the person, a police officer on behalf of himself and the chief of police, wanting a complaint issued. That statement misstates the record. Why? He doesn't go there wanting a complaint issued. He was told by the chief, and the reason he went there was to find out if the DA thought a complaint should be issued. Well, don't you think it could have been somebody else if they were really wanting a neutral reaction? This is routine. He and the DA testified both that it was routine for Mendenhall to come over there. Of course it wasn't. It wasn't routine for Mendenhall to be the victim of the crime. I understand what you're saying. I'm simply saying that the record is that he gave him the report. He walked out of the room. He let the DA decide what he was going to do with it, and he made it clear to him that he was over there asking for advice. You tell me what you want to do with this. He leaves. DA says, contrary to the implication— I thought there was some contradiction in the record. I thought one of them said he was there and the other one said he wasn't. I don't believe so. And the DA says, they didn't tell me they wanted a complaint. He was very emphatic about that. They didn't tell me they wanted it done today. They didn't tell me anything. I looked at it, and I decided to issue it. Now, he was instructed not to answer when some question was asked about him being pressured. What does it mean to issue a complaint in this context, as I say? He didn't sign it. Something must have happened afterwards. They got it into court. There's another paper. I can explain that. Okay, would you? The routine procedure in San Bernardino. And all I'm saying—the reason I keep saying it's routine is there's nothing special about how it was done here. Once the DA decides—that's the sine qua non. The DA has to decide that there's going to be a complaint issued. Then, yes, the DA gins it up, has the officer sign it. The DA then took it down and filed it. No, he didn't. He said he didn't. He said, I gave it to them and— Oh, okay. He told them to go file it, and then— He told them to go down to the office and get a stamp on it or something. What they were filing, as I understand it, at that point, the whole point was to get the arrest warrant, not— Well, what I want to know is at what point was something generated that got the case into court? Because that matters in this city for some reason. When you take it downstairs, you take it down to the court and file it. It becomes a filed complaint at that point. That's when the case got started. Is that in your record? I'd have to go back and look with some particularity. We know that they applied for an arrest warrant right away, but we don't know what else they did. For some reason, this matters under Smitty, what the time sequence is. I'm sorry? For some reason, under Smitty, the time sequence matters. Well, the reason that it matters—actually, under Smitty, there was an arrest first, then a DA file of charge that was done without probable cause, and it was dismissed on that basis, and the court held that it still broke the intervening chain. What we're saying here is that Mendenhall was more cautious than that. He went to the DA and said— No, it wasn't dismissed. The four days before the complaint was filed or the case was instituted, they did get damages. It was only thereafter. That's why it matters. Right. But I'm saying here it happened before. That's why under the Smitty analysis— Well, can you explain how Smitty and Malley could possibly be reconciled? Here we have Malley saying that there's no intervening cause if you go to a magistrate, but as you're reading Smitty, there is an intervening cause if you go to the DA. So the DA's determination of probable cause is worth more than the magistrate's determination of probable cause. Why? I can only suggest that when one reads the language of Smitty, the court talks about the fact that it is the DA's job to sit there and decide whether or not to institute prosecution and that the court felt, for whatever reason, that that distinguished it from being a magistrate and that the DA was being paid to make that decision as— The magistrate's being paid to make the decision. We have all these opinions about how important it is to go to a magistrate. I understand that. However, the magistrate did not institute prosecution in— Yes, but here, you see, we're not dealing with it. This is why it's such a difficult case. Insofar as he was bringing a—if he were bringing a malicious prosecution case, obviously he'd be—it wouldn't work. But he isn't doing that. He is simply concerned with the arrest warrant and the arrest. And so he's concerned with the piece of it that Malley was concerned with, which is that he got—that they got an arrest warrant without probable cause, and the pieces of paper look exactly the same as they would have looked in Malley, with the possible exception that it says on it that there was a complaint issue. But what difference does that make to the magistrate? The magistrate still wants to know, was there probable cause? And I'm suggesting two things. The DA thought there was probable cause. He made an independent decision about that. He is so testified, as has Mendenhall, when he said, I didn't tell him what to do, I didn't ask him to do anything. Then you have the situation that, based on People v. Hines, I don't believe that one can say that a reasonable police officer would not have believed that this could have constituted a threat. The people who told him the threat was they didn't believe it, no judge, nobody who looked at this context believed it. I understand that. I understand that. But what I'm saying is, at the point where— Let's watch that out for present purposes, because that's not what's troubling me. I mean, you're either right or wrong about that, but I want to know how you can make sense of Smitty and Malley in the circumstance where what we're talking about was going to get the arrest warrant. The only thing that I can say here that I believe distinguishes it is that Mendenhall did not seek an arrest warrant in the sense that— Of course he did. He filed a piece of paper. That was after the DA had made his decision. But he did. He did seek an arrest warrant. He himself sought an arrest warrant. He took the pause that they talked about in Malley, and that's what they said he was supposed to do. He was supposed to pause and consider his actions. And what he did—how can you have a well-trained officer if he goes to the top law enforcement office in his county, and he says, what's the law on this? And that law enforcement officer, the DA, tells him, this is the law. This thing violates Penal Code Section 69. At that point, he has taken the step that Malley wanted him to take. He has stopped. He's considered it. He even went further than to reflect, as Malley says, on what are my obligations. He actually went and asked. And he said to the DA, you tell me. Does this violate 69? And the DA said, yes, it does. I'm going to issue a complaint. Based on that, Mendenhall followed the procedure. He signed the complaint, took it down, filed it, and got an arrest warrant and went out. Thank you, counsel. Thank you. Thank you. We'll give you an extra minute or so. May I say one thing? Very quickly, please. Hartman, I do not believe in the situation applies because there simply isn't any evidence that— I understand that, but it is a motion for summary. I understand. In my minute, let me just point the Court to People v. Hines actually points out the importance of context, because what was going on there was the defendant in that case had been arrested. He had used profanity and disobeyed orders to stand behind a yellow line with his hands in his pocket while he was in custody. He then refused to have his picture taken. Then he became hostile and argumentative so that he had to be physically restrained. Defendant said that Deputy Warren would, quote, be sorry he ever saw defendant. After the photographs were taken, defendant threatened to throw bars of soap at Warren. Later that day, Warren encountered defendant in the jail lobby and said, I'm going to kill you. This is a threat. You're dead. In terms of Smitty, let me just point the Court to the second Smitty opinion at 803 F. 2nd at pages 1472 and 1473, where the Court talks about the culpability and the part of the officers as being in the form of negligence, whereas in Malley and in this case, we are talking more than just negligence. We're talking about clearly established law that the officers had a duty to know in an— But that's always true in a qualified immunity case. Anyway, thank you, Counsel. Thank you. Thank you for an interesting argument in a very hard case. We will go on and submit the case of Beck v. City of Upland, and we will go on to Davis v. Astro.
judges: Berzon, Ikuta, Singleton